UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| NORFOLK SOUTHERN, RAILWAY COMPANY | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CAUSE NO.: 3:07-CV-145 JVB |
| KELLY TURNER and DANIEL SCHENK, | ) ) ) ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Defendants Kelly Turner and Daniel Schenk were employed be Plaintiff Norfolk Southern as the crew of a train when it collided with another train, causing both to derail. They claim that a signal malfunctioned and caused the accident. Plaintiff Norfolk Southern filed suit against Defendants for damages and filed a motion for partial summary judgment on the issue of liability, claiming the signal worked properly and that the accident was the Defendants' fault. The physical evidence in this case demonstrates that the signal could not have malfunctioned; therefore the Plaintiff's motion must be granted.

**A.  Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. Rule 56(c). Once the moving party has produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must

affirmatively demonstrate that a genuine issue of material fact remains for trial. *LINC Fin. Corp. v. Onwuteaka,* 129 F.3d 917, 920 (7th Cir.1997).

In deciding a motion for summary judgment, a court must "review the record in the light most favorable to the nonmoving party and . . . draw all reasonable inferences in that party's favor." *Vanasco v. National-Louis Univ.,* 137 F.3d 962, 965 (7th Cir. 1998). Nevertheless, the nonmovant may not rest upon mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986), or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252. It is well-settled that summary judgment should be granted "only where it is perfectly clear that there is no dispute about either the facts of the controversy or the inferences to be drawn from such facts." *Cent. Nat'l Life Ins. Co. v. Fid. & Deposit Co. of Md.,* 626 F.2d 537, 539 (7th Cir.1980) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)).

**B.     Background and Facts**

For purposes of ruling on the Plaintiff's motion for summary judgment, the Court finds that there is no genuine issue as to the following material facts:

On February 21, 2007, Defendants Kelly Turner and Daniel Schenk made up the crew on Norfolk Southern Train 38E. Train 38E was supposed to travel from Elkhart, Indiana, to

Melvindale, Michigan, on the Chicago Line, which is part of the Dearborn Division. Turner and Schenk were both familiar with the signals between the two yards. Both men felt that they had slept enough to successfully complete their job-related tasks on February 21. They inspected the train, and would not have left if they had concerns about their ability to safely operate Train 38E.

Turner and Schenk both knew that the Operating Rules called for each of them to vigilantly look for signals and conditions along the track. They were both responsible for the safety and movement of the train, and for obeying all signals. In addition, Turner and Schenk also knew that the Operating Rules required each of them to call out the name and aspect of each signal affecting their train when the signal first became visible, and that one of them needed to call the signal out over the radio. Finally, the Operating Rules required the engineer and conductor to take a second look at every signal and to audibly reconfirm the aspect it displayed before the train passed the signal.

After leaving Elkhart Yard, Train 38E encountered several signals. The signals in the area east of Elkhart Yard on the Chicago District are laid out in descending order from west to east. The signals Train 38E passed just before the accident started with signal 421 and continued to Control Point ("CP") 412.[1] Train 38E passed signals 421, Main Street, 419, 417, and 415 without incident on its way toward Goshen. Turner and Schenk do not recall ever having any problems with the signals from 421 to 412 before this incident, and neither do they remember anyone else having problems with these signals.

The area east of Elkhart Yard on the Chicago District is equipped with dual tracks; the

---

[1] A Control Point signal, such as CP 412, continuously displays an all-red aspect until a dispatcher requests something more permissive. When trains advance toward a red CP signal, automatic signals on the line display an approach aspect.

north track is referred to as Track Number One, and the south track is called Track Number Two. Signal 414 2E is located about two miles before 412 (the interlocking signal). The signal at CP 412 displays a red aspect until the dispatcher requests something more permissive. When the dispatcher does so, the relay logic checks the routes to determine whether that signal can safely be displayed. The signal system is designed so that if the CP 412 signal is displaying a red aspect, the 414 2E signal automatically displays an approach (yellow over red) signal when an eastbound train passes CP 415 and enters the approach circuit for 414 2E. An approach signal requires trains traveling more than 30 miles per hour to reduce to medium speed (less than 30 mph) and to be prepared to stop at the next signal.

On February 21, Train 38E was headed east on Track Two while Train 681B was moving west on Track Two. At the time of the collision, Train 681B was moving through the #3 crossover at CP 412, diverting from Track Two to Track One. Defendants claim that at the time the crew of 38E observed it, the signal at 414 2E was a clear (green). However, Plaintiff claims that the signal at 414 2E was an approach (yellow over red).

Turner claims that just after passing the CP 415 signal, he saw the 414 2E signal about one mile away showing a clear (green) signal and called out the signal inside the cab. Turner did not hear Schenk call out the 414 2E signal in response, and does not know whether Schenk called the signal over the radio. At this point, the Operating Rules required Turner to take some action to confirm that Schenk had seen the signal. However, Turner did nothing. Under the Operating Rules, Turner was also supposed to look at the signal a second time before the train passed the signal. However, he admits that he did not look back at signal 414 2E and so cannot

4

say what it actually was when Train 38E passed it.[2]

Schenk does not remember seeing the 414 2E signal, nor does he remember Turner calling that signal. Between the time Train 38E left Elkhart Yard and the time of the collision, Schenk sent and received several text messages, but claims that those messages were not sent after they passed signal 421. After signal 414 2E, Defendants did not reduce the speed of Train 38E. The parties disagree as to when Turner activated the emergency brake, but it is clear that Train 38E did not stop in time and collided with Train 681B, causing both trains to derail.

Following the derailment, Dearborn West Assistant General Supervisor of Communications & Signals James Wentzel ensured that the signal cases and heads for CP 412 and 414 2E were locked so that it was impossible to change any of the components. All signal bulbs tested within the proper voltage limits following the collision. The electrical resistance of all signal cables between and related to CP 412 and 414 2E tested perfectly. A two-day signal watch confirmed the 414 2E and CP 412 signals were operating as intended.

Playback of the Digicon Train Control System[3] established that at 12:30 p.m. the #3 crossover in the CP 412 interlocking was lined up for Train 681B to move from Track Two to Track One. The Digicon System also showed that Train 38E indicated on the first circuit east of 415 at 12:31:35 pm, which is after the CP 412 interlocking was lined up for Train 681B. When an eastbound train enters this circuit, the 414 2E automatically displays the signal aspect permitted by the relay logic received from CP 412, which would be an approach signal when CP

---

[2] Turner testified that signals can not change from the time a crew member first sees it to when the train actually passes it.

[3] This is a system that shows conditions in the area of the CP 412 from about five minutes before and immediately after the collision.

412 is displaying a red aspect. The dispatcher's log confirms that the signal at CP 412 was red when Train 38E was on the approach circuit for the 414 2E signal.

On March 7, 2007, a re-enactment simulated an eastbound train moving through the circuit while the CP 412 signal was displaying all red and the 414 2E signal functioned properly. Tests performed before the collision confirm that the 414 2E and CP 412 signals were operating as intended. Further, tests performed after the collision indicate those signals continued to operate as designed.

Supervisor Wentzel did not receive any reports of signal failure, "false proceeds," or problems with visibility at the 414 2E signal before the collision, but defendants mention several anecdotes of alleged signal problems at other locations. Defendants claim that Art Tesci of Signal Maintenance may have heard about signals malfunctioning, but he cannot remember where or when this took place. They also point out that once during his career Supervisor Wentzel found a false proceed signal. However, this signal was controlled by a dispatcher, and was not an automatic signal like the 414 2E at issue here. Additionally, Wentzel found the problem by putting a cable together. Testing performed after the collision in Goshen would have revealed this type of problem, if it existed. In addition, the Trouble Desk logs show that there had been no problems with signal 414 2E from 2005 to 2007.

**C.     Analysis**

**1.     Physical Facts Rule**

The Defendants claim that it is not their fault Train 38E collided with Train 681B. Instead, they allege that the signal system malfunctioned, causing the wrong aspect to be

displayed at 414 2E. Defendants claim this malfunction led them to believe that they did not need to slow down their train. On the other hand, Plaintiff alleges that all of the physical evidence shows this signal system was working properly. Plaintiff claims that Turner's testimony regarding the aspect of signal 414 2E is inherently not credible because it is contrary to the physical evidence. Defendants argue that Plaintiff's motion for summary judgment should be denied because the physical facts evidence does not apply here as there is testimony from Turner that the signal was clear and evidence that the signal malfunctioned.

However, Defendants "must do more than simply show that there is some metaphysical doubt as to the material facts" to avoid summary judgment. *Matsushita Elec.*, 475 U.S. at 586. "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Ind. Bell Tele. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995). And, "[a] party needs more than a scintilla of evidence . . . to defeat summary judgment." *Senner v. Northcentral Tech. Coll.*, 113 F.3d 750, 757 (7th Cir. 1997). "[T]he mere possibility that a factual dispute may exist, without more, is an insufficient basis upon which to justify denial of a motion for summary judgment." *Posey v. Skyline* Corp., 702 F.2d 102, 106 (7th Cir. 1983). The Seventh Circuit has consistently held that "summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Johnson v. Cambridge Industries, Inc*. 325 F.3d 892, 901 (7th Cir. 2003) (citing *Schacht v. Wisc. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).

The physical facts doctrine states that testimony positively contradicted by the physical facts of the case has no probative value and must be disregarded. *Conner v. Jones,* 59 N.E.2d

7

577, 581 (Ind. App. 1945). "Under the 'physical facts rule' oral testimony of a witness may be disregarded when positively in contradiction to the physical facts." *Grant v. Cia Anonima Venezolana de Navegacion*, 228 F. Supp. 232, 235 (D.C. La. 1964) (citing *Whittington v. Mayberry*, 190 F.2d 703, 705 (10th Cir. 1951)). "It is well settled . . . that the testimony of a witness which is opposed to the laws of nature, or which is clearly in conflict with principles established by the laws of science, is of no probative value and a jury is not permitted to rest its verdict thereon." *Conner,* 59 N.E.2d at 581.

The Seventh Circuit Court of Appeals applied the physical facts doctrine to a case in which a mechanic claimed that he properly positioned a car on a vehicle hoist, and that it was a defective design that allowed the car to fall off the hoist. *Zollman v. Symington Wayne Corp.*, 438 F.2d 28, 30–31 (7th Cir. 1971). The mechanic testified that he checked the position of the front crossbar of the hoist and pressed it back against the front tires. *Id.* at 31. However, the evidence was clear that if the crossbar was pushed against the front tires, there was no way the car would completely fall off the hoist. *Id.* Experts conducted tests and concluded that the hoist would drop a car only if the crossbar was positioned incorrectly under the bumper. *Id.* The court used the physical facts doctrine and held the mechanic's testimony was contrary to the physical evidence and therefore was not entitled to belief by the jury. *Id.* Since the plaintiff's case depended on the mechanic's testimony, the court held that the trial judge erred in denying defendant's motion for a directed verdict. *Id.*

In its ruling, the Seventh Circuit reviewed other cases in which courts applied the physical facts doctrine. *Id.* at 32. These cases are instructive here. In *Atlantic Coast Line Railroad v. Collins,* 235 F.2d 805 (4th Cir. 1956), a railroad employee claimed he injured his

8

back trying to move a switch. However, the Court of Appeals for the Fourth Circuit held that his testimony had to be disregarded because there was evidence he moved the switch without trouble many times that same night, and that other employees moved the switch easily after the injury. *Id.*

Another court applied the physical facts doctrine and refused to give credence to a witness's testimony because it was positively contradicted by physical evidence. *Grant*, 228 F. Supp. at 235. The witness testified that a certain winch system was electric and was prone to cutting off. *Id.* at 234. However, investigation and tests before and after the incident indicated that the particular winch at issue was hydraulic. *Id.* The court held that the facts "crie[d] out for the application of the physical facts doctrine" and the testimony had to be disregarded because the evidence the plaintiff relied on was "hopelessly in conflict with one or more established and uncontroverted physical facts." *Id.* at 235 (citing *Travelers' Indemnity Co. v. Parkersburg Iron & Steel Co.*, 70 F.2d 63 (4th Cir. 1934)). Not all evidence triggers application of this rule, but normally, when a court refuses to apply the physical facts doctrine, it does so because it is faced with "many variable factors about which no precise testimony could be given." *Zollman*, 438 F.2d at 32. The court in *Zollman* held that those variables were not present, and therefore the physical facts doctrine allowed the court to find that it was the misuse of the hoist that caused the car to fall. *Id.*

Likewise, no variables are present here to diminish the strength of the physical evidence presented. The Defendant has no evidence to challenge time or train speed estimates. This is similar to *Collins* because the device at issue worked properly before and after the incident. Besides Turner's claims that he saw a green signal, there is no evidence to cast any doubt that

9

the 414 2E signal functioned properly. In fact, neither Turner nor Schenk recall ever having problems with 414 2E and they do not remember anyone else having problems with it. Supervisor Wentzel did not receive any reports of signal failure, and the Trouble Desk logs show there had been no complaints with the 414 2E signal any time between 2005 and 2007.

The present case is also analogous to *Zollman* because in both cases tests demonstrated that the device at issue was working properly. Tests before and after the train accident showed that the signals were working as designed. A re-enactment simulated an eastbound train moving through the circuit while the CP 412 was displaying all red. The 414 2E signal functioned as designed in that simulation. Further tests showed that the voltage, resistance of the signal cable, and relay were all functioning properly.

Defendants bring up several reasons why the physical facts doctrine should not apply, but these arguments fail. First, Defendants claim that because the tests were conducted by the Plaintiff, the test results cannot suffice as clear physical evidence for applying of the physical facts doctrine.[4] However, Defendants do not cite to any authority to support their view that under the physical facts doctrine tests must be conducted by both parties. Most importantly, Defendants do not establish that the Plaintiff's tests were in any way flawed.

Second, Defendants claim that if a rail view camera had been attached, it would have recorded the signals passed during defendants' trip. While this may be true, there is no law

---

[4] The Federal Railroad Administration also investigated and found that the signals and train control systems were functioning properly. There is some dispute over whether this report is admissible, but courts in other circuits have routinely admitted these types of factual reports. *See In re Air Crash at Charlotte, N.C.*, *on July 2, 1994*, 982 F. Supp. 1071, 1077 (D.S.C. 1996) (listing cases that have admitted factual reports prepared by an agency of the federal government). Even without the added weight of the FRA report, Plaintiff has provided enough evidence for this court to apply the physical facts doctrine.

10

requiring the camera. Further, it could have just as easily showed that signal 414 2E displayed an approach aspect. The idea that a camera would have provided evidence that signal 414 2E was clear is speculation, and "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008). Instead, the tests demonstrated that the signal system was working properly before and after the incident, and that it was not possible for 414 2E to have displayed a clear (green) signal while Train 38E was on the approach circuit.

Third, defendants submit evidence that Signal Maintainer Tesci may have heard of signals malfunctioning, but he cannot remember when or where this occurred. They also claim that Supervisor Wentzel once located a "false proceed" at another location through testing. However, that signal was not an automatic signal like 414 2E. The incident Mr. Wentzel recounted does not have bearing on this case, because it was a different type of signal and if there was any malfunction present here like the cable problem he found earlier, it would have been discovered through the testing that was conducted. Defendants also submit affidavits from other employees alleging signal failures. However, none of the situations described by these employees involve signal 414 2E. In addition, all the incidents mentioned in these affidavits can be traced, through testing, to a demonstrable reason. Anecdotes about supposed problems with other signals at other locations are not a substitute for real evidence about 414 2E.

Defendants have not produced evidence that the signal at 414 2E could have been clear when they approached and passed it. The system was designed for 414 2E to display an approach aspect when CP 412 was red, which was the case here. Tests show the system was functioning properly. Turner's claim that the signal was clear must be discounted because all the physical

11

evidence contradicts his testimony. There is no evidence of problems with this signal. Concrete physical evidence established that signal 414 2E was functioning properly. Defendants have not introduced anything that challenges this conclusion, which is supported by the test results, the earlier reports of 414 2E, and the Trouble Desk logs. Accordingly, this is a proper case to apply the physical facts doctrine, and that rule requires disregarding Turner's testimony that the signal was clear because it is positively contradicted by physical facts. Schenk does not recall seeing the 414 2E signal. Therefore, neither defendant can know what aspect the signal showed when Train 38E approached and passed it.

Defendants have not produced any evidence that 414 2E malfunctioned on February 21, 2007. To the contrary, the surrounding facts, the spotless record of the signal system, and all the tests performed indicate that the signal did function properly.

**D.     Conclusion**

No reasonable jury can find that signal 414 2E was clear when Train 38E approached and passed it. The physical facts doctrine indicates that any testimony to the contrary must be disregarded. Turner's claim that the signal was clear is insufficient to avoid summary judgment because the physical evidence shows the light was not clear. Tests before and after the accident, testimony from railroad employees, and the Defendants' own admission that they had never had a problem with 414 2E show that the signal was functioning properly on February 21, 2007. For these reasons, the Plaintiff's Motion for Partial Summary Judgment as to the issue of liability is granted.

SO ORDERED on January 6, 2009.

   s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE